**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DISVISION**

| | |
|---|---|
| **LORIAN M. CRAWFORD,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **Case No.:** |
| ) | |
| **PILOT.COM, INC.,** ) | |
| ) | |
| **Defendant.** ) | |

**COMPLAINT**

1. Plaintiff, Lorian Crawford ["Plaintiff" or Ms. Crawford"], is a resident of Shelby County, Tennessee. Specifically, Plaintiff resides at 1001 June Road, Memphis, Tennessee 38119.

2. Defendant, Pilot.com, Inc. ["Pilot"], is a Delaware Corporation with its principal place of business in San Francisco, California. Its registered agent for service of process is United Agent Group Inc., 205 Powell Place Brentwood, Tennessee 37027-7522.

3. This action is filed pursuant to the 42 U.S.C. § 1981, as amended; and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq* ["Title VII"]. Each of the foregoing statues provide in pertinent part that all employees should be protected from, *inter alia*, discrimination in employment and that all employees' interests in dignity and freedom from humiliation should be protected.

4. This Court has federal question over this case pursuant to 28 U.S.C. § 1331 and 1332.

5. This Court is the proper venue pursuant to 28 U.S.C. § 1391(b) and (c) because

1

Plaintiff worked at Pilot's facility in Davidson County, specifically the 2030 Lindell Avenue Nashville, Tennessee 37203 location from 2019 until 2021. In 2021, Plaintiff began working remotely from her residence located at 1001 June Road, Memphis, Tennessee 38119.

6. Defendant employs more than 500 employees.

7. On or about September 23, 2019, Plaintiff was hired at Pilot.com as an Account Manager, a position in the Finance Operations ["FinOps"] department, where she would perform bookkeeping services for customers. Plaintiff is a black female. Throughout her employment, Plaintiff was a good, effective employee. Plaintiff had no discipline prior to her termination.

8. Sometime in 2020, a "Level 2" role was added to her profile without discussion. Plaintiff brought to the attention of Ashley Schagrin ["Schagrin"] Director of R&D and Operations in San Francisco, California, that there should have been a discussion for the transition that included a promotion and raise. Plaintiff is aware of other black employees who were hired around the same time as Plaintiff that had also been assigned random role levels and had issues with promotions and raises.

9. In January 2021, Plaintiff became a Senior Account Manager and a pod lead within the Capricorn team with Andrew Bellieveau ["Supervisor"] as her supervisor. Plaintiff was told she could pick two individuals to be in her pod, wherein she picked two black males. Plaintiff's supervisor told her no because "then all black people will be together." Plaintiff reported this to Schagrin because it was never an issue if all white people were in the same pod and she was told she could choose. Schagrin's response was that Plaintiff "misunderstood" her Supervisor's remark and that the company decided that one of them would become a pod lead as well. Instead, a white female was placed as pod lead. Plaintiff's reporting of a discriminatory remark was not taken seriously and no investigation was rendered in response, therefore violating Pilot's Harassment

Prevention Policy (page 15). Further, management was not held under the same umbrella as far as discipline for not following the company's policy.

10. In June 2021, Plaintiff's position was renamed to Senior Finance Operations Account Manager within the FinOps team, making her designated pod leave position a Level 3 position which comes with a raise. Plaintiff was the only person in her position that was not given a raise. Plaintiff did not receive a direct answer as to why when she reached out to Andre Moss ["Moss"], Head of Operations.

11. In January 2022, Plaintiff was reassigned to the G&A Internal Operations team as an Internal Operations Senior Associate where she would train new hires on the bookkeeping services, which is a demotion, a textbook example of retaliation, even according to Pilot's policy.

12. From October 3, 2022, until December 27, 2022, Plaintiff was on FMLA. While on leave, Moss gave her a negative 360 review, a scale grading system the company uses to critique employee performance, ranging from "does not meet most expectations" — the lowest rating— to "sets a new bar" — the highest rating, conducted every six (6) months. Plaintiff received a "Meets Most Expectations" review in her October 2022 evaluation although the words "will come back to this" were recorded in the remarks for her evaluation with no real indication of why she received that review.

13. Plaintiff's comparator, Level 2 white male, received the "Exceeds Expectations" on his October 2022 evaluation, which included the reasons he received that review. Another comparator, white female, received a "sets a new bar" October 2022 performance evaluation with reasons as to why she received that review.

14. Another comparator to Plaintiff, black female, was denied the opportunity that a white female was given. Specifically, their manager (white female) broke the policy for promotion

or transfer because she promoted the white female when she was hired less than six (6) months previous. Upon information and belief, said manager was flagged to the FinOps leaders on multiple occasions for being hostile and discriminatory. Plaintiff personally flagged an incident of harassment on her and others to Schragin. No investigation was documented or administered, therefore violating Pilot's Harassment Prevention Policy again.

15. Plaintiff witnessed a similarly situated black female's situation regarding FMLA. This black female needed to utilize the company's unlimited sick leave policy for a medical condition. Co-founder and CTO, Jessica McKellar ["McKellar"] denied her request just short of being eligible for FMLA and claimed that her leave could only be approved at the discretion of the leadership team. In fact, co-founder Jeff Arnold ["Arnold"] created and emailed a new sick policy, changing "unlimited" to "flexible." Her condition worsened and she was forced to leave Pilot.

16. After witnessing the company's actions against the similarly situated black female, Plaintiff decided to speak up in an All Hands meeting to question the high turnover of black employees. Arnold responded publicly while McKellar reached out to Plaintiff privately in hopes of squashing, not resolving, the issues Plaintiff reported with regards to discriminating against black people.

17. When Plaintiff returned from FMLA leave on about December 27, 2022, she met with Carmen Cooper, VP People, ["Cooper"] and discussed some of her hardships, including the loss of over six (6) family members since August of that year, and mentioned that she felt fear of being targeted for layoff since she took a long leave of absence, although Pilot had an unlimited PTO policy.

18. Cooper encouraged her to meet with Moss about the upcoming FinOps

reorganization that was going into effect on February 1, 2023, that was announced in mid-December 2022 while Plaintiff was still on FMLA leave. Plaintiff was told that each person on her team needed to consider a new role to align with the needs of the restructured FinOps team and was given the options to serve on the Centralized Reviewer Team, return to the customer-facing IC role, or ask for another role that she was interested in.

19. Plaintiff was told by Moss in a one-on-one Zoom meeting that "Yeah, we have to get you moved into another role because they're still gunning for you," confirming that the leadership, including Arnold and McKellar, were still sore about Plaintiff's efforts to bring up the discrimination issue within the company. McKellar and Schagrin had been publicly disparaging her behind her back and trying to get rid of her since 2021.

20. The week of January 3, 2023, Plaintiff was told in a one-to-one meeting with Moss that she should work in Operations team one hundred percent (100%) of the time and was assigned the review workload for four members on the onboarding team. Plaintiff was also informed of the opportunity to take on a new role on the Centralized Reviewer Team or any other roles in the team that she was interested in.

21. On or about January 10, 2023, Plaintiff learned of two people on her team, FinOps, that received promotions to the Centralized Reviewer Team, *both white*.

22. According to Coral Feigin, recruiter, "the hiring process was racist and was particularly to Black people" and "Black people just did not get hired at the same rate as white people." Coral also believed that the company made it impossible to bring attention to the racist hiring practices.

23. While happy for her "Co-Pilots," Plaintiff was confused when she received an email from the CEO on or about January 13, 2023, that was sent out stating that the company was going

to lay off forty-seven (47) talented members of the team—eleven percent (11%) of the company—for financial reasons although it was stated in an All Hands Meeting that the layoff would not include the people on the Operations Team—which Plaintiff was told to work 100% on duties impacting Operations. Therefore, Plaintiff was not given enough time to make a decision on assuming a new role and position to the FinOps shift given she learned about it less than three (3) days before she was terminated. Plaintiff was caught by surprise that she was considered for a layoff when none of her meetings prior to the layoff insinuated that she should be nervous about her job.

24. That same day, January 13, 2023, Plaintiff received a termination notice via email from the CEO, Waseem Daher ["Daher"], stating that her position in Internal Ops was a part of Pilot's reduction in workforce and that her access to the company, even her email address was immediately revoked.

25. Plaintiff reached out to McKellar concerning the reason for the layoff. Plaintiff was told by McKellar that she could apply for an open position.

26. Plaintiff received correspondence from McKellar explaining the reason for the layoff including, but not limited to, the macroeconomic headwinds and the headcount reductions were determined based on business need, whether the functions of the role could be assumed by an employee in a different role, and performance.

27. McKellar further stated that the Ops reorganization was independent of the layoff and that the reason for the reorganization was not to eliminate the internal G&A team but to provide opportunities for internal mobility.

28. Plaintiff has never had to go through an application and evaluation process to move into a new role or be promoted during her tenure with the company as McKellar required through

email correspondence.

29. Plaintiff was reporting directly to Moss from the time of her return to the time of termination. McKellar stated that Moss was kept out of the loop about the planned reduction until January 12, 2023, therefore relaying false hope to Plaintiff of moving to another job position that Moss mentioned to her in their meeting on January 3, 2023.

30. McKellar claims that moving her from the G&A type of work into the Operations work 100% of the time was due to no training scheduled during the holidays and that she would have had to apply and be evaluated for the new role.

31. The following day, Plaintiff reached out to Moss and was told that he would be happy to speak on her behalf about getting another position within the company.

32. Plaintiff's job position, G&A Internal Operations team, falls under the Operations umbrella. Of the four members of her team, she was selected as the only member on her team to be terminated.

33. On or about January 17, 2023, Plaintiff applied for the Senior Finance Operations Account Manager position in which she was qualified for and had previous work experience at Pilot, but yet received the generic email stating she was not chosen at this time. Upon information and belief, Plaintiff was not even considered for new hire because of the termination, which again violates Pilot's Harassment Prevention policy and further evidences retaliation.

34. On or about February 7, 2023, Plaintiff was not selected for the position and, therefore, filed her EEOC charge that very day.

35. Since her unlawful termination, Plaintiff has experienced a decline in her overall health including but not limited to increased emotional distress.

36. Because of her unlawful termination, Plaintiff is now suffering on-going loss of

wages. Plaintiff had planned to work until age 70. She should be compensated for her wage losses and all other benefits she would have been entitled to had she remained employed.

37. As a direct and proximate result of the discriminatory acts set forth above, Plaintiff has suffered the following injuries, including but not limited to:

    a. Embarrassment;

    b. Humiliation;

    c. Loss of self-esteem;

    d. Increased anxiety;

    e. Damage of reputation;

    f. Loss of concentration.

38. The foregoing injuries set forth have been suffered and will continue to be suffered into the foreseeable future.

39. Plaintiff should be made whole for all injuries and losses suffered by Plaintiff as a proximate result of Defendant's unlawful acts.

40. Defendant has intentionally, willfully, and/or recklessly violated Plaintiff's rights. An award of punitive damages is appropriate under the law.

## **COUNT I – RACE DISCRIMINATION § 1981**

41. The allegations contained in paragraphs 1 through 40 are incorporated by reference into this Count I.

42. Federal law, specifically 42 U.S.C. § 1981, as amended, states in pertinent part that all employees should be protected from, *inter alia*, discrimination that all employees' interests in dignity and freedom from humiliation should be protected.

43. Plaintiff's adverse employment action was based on her race (black) in violation of 42 U.S.C. § 1981, as amended.

44. Accordingly, Plaintiff is entitled to a damages award against Defendant for all back pay, front pay, lost benefits, prejudgment interest, tax gross-up, attorney's fees, and expenses. Finally, because of Defendant's willful and intentional conduct and reckless disregard for Plaintiff's federally protected rights, Plaintiff is entitled to an award of punitive damages against Defendant.

## COUNT II- TITLE VII RACE DISCRIMINATION

45. The allegations contained in paragraphs 1 through 40 are incorporated by reference into this Count II.

46. Plaintiff filed a Charge of Discrimination (No. 490-2023-01247) with the EEOC on February 7, 2023. The foregoing charge was filed within 300 days of Plaintiff's wrongful termination and is attached here as Exhibit A.

47. The Notice of Right to Sue was sent on the grounds that they will do no further investigation. The foregoing Complaint was filed within 90 days of Plaintiff's receival of the Right to Sue Letter on August 22, 2024. Attached as Exhibit B and incorporated by reference as though fully restated herein is Dismissal and Notice of Rights.

48. This claim was therefore timely filed, and Plaintiff has exhausted all of her administrative remedies on her claim.

49. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, provides in pertinent part that it shall be an unlawful employment practice for an employer to discharge any individual on the basis of race.

50. Plaintiff's termination was based on her race (black) in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e.

51. Accordingly, Plaintiff is entitled to a damages award against Defendant for all back pay, front pay, lost benefits, attorney's fees, and expenses. Finally, because of Defendant's willful and intentional conduct, Plaintiff is entitled to an award of punitive damages against Defendant.

## COUNT III - § 1981 RETALIATION

52. The allegations contained in paragraphs 1 through 40 are incorporated by reference into this Count III.

53. Federal law, specifically 42 U.S.C. § 1981, as amended, provides that an employer should not retaliate against employees for engaging in protected activity.

54. Plaintiff's termination was based on retaliation for her engagement in protected activity in violation of 42 U.S.C. § 1981, as amended.

55. Accordingly, Plaintiff is entitled to a damages award against Defendant for all back pay, front pay, lost benefits, prejudgment interest, tax gross-up, and attorney's fees and expenses. Finally, because of Defendant's willful and intentional conduct and reckless disregard for Plaintiff's federally protected rights, Plaintiff is entitled to an award of punitive damages against Defendant.

## COUNT IV – TITLE VII RETALIATION

56. The allegations contained in paragraphs 1 through 40 are incorporated by reference into this Count IV.

57. Plaintiff filed a Charge of Discrimination (No. 490-2023-01247) with the EEOC on February 7, 2023. The foregoing charge was filed within 300 days of Plaintiff's wrongful termination and is attached here as Exhibit A.

58.     The Notice of Right to Sue was sent on the grounds that they will do no further investigation. The foregoing Complaint was filed within 90 days of Plaintiff's receival of the Right to Sue Letter on August 22, 2024. Attached as Exhibit B and incorporated by reference as though fully restated herein is Dismissal and Notice of Rights.

59.     This claim was therefore timely filed, and Plaintiff has exhausted all of her administrative remedies on her claim.

60.     Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, provides in pertinent part that it shall be an unlawful employment practice for an employer to discharge any individual in retaliation for her engagement in protected activity.

61.     Plaintiff's termination was based on retaliation for her engagement in protected activity in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e.

62.     Accordingly, Plaintiff is entitled to a damages award against Defendant for all back pay, front pay, lost benefits, prejudgment interest, tax gross-up, and attorney's fees and expenses. Finally, because of Defendant's willful and intentional conduct and reckless disregard for Plaintiff's federally protected rights, Plaintiff is entitled to an award of punitive damages against Defendant.

## **PRAYERS FOR RELIEF**

WHEREFORE, Plaintiff prays that:

1.      The Court order Defendant to rescind all adverse employment actions taken against Plaintiff.

2.      The Court order Defendant to make Plaintiff whole for all lost wages and fringe benefits, back pay, front pay, loss of earning capacity, and emotional distress relating to Defendant's wrongful acts of discrimination.

3. The Court order Defendant to pay prejudgment interest, tax gross-up, attorney's fees and expenses.

4. The Court order Defendant to reinstate Plaintiff with all back pay if that is determined to be the proper remedy.

5. The Court award Plaintiff punitive damages.

6. The Court award Plaintiff liquidated damages.

7. The Court grant Plaintiff all other relief to which she is entitled.

8. Plaintiff demands a jury trial.

    Respectfully submitted,

    /s/ Ralph T. Gibson_____
    Ralph T. Gibson (BPR #14861)
    GIBSON PERRYMAN LAW FIRM
    *Attorney for Plaintiff*
    5100 Poplar Avenue, Suite 2117
    Memphis, Tennessee 38137
    (901) 526-0412
    Ralph@GibsonPerryman.com