IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DISVISION

| | |
|---|---|
| **LORIAN M. CRAWFORD,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No.: 2:24-cv-02907-TLP-atc |
| ) | |
| **PILOT.COM, INC.,** ) | |
| ) | |
| Defendant. ) | |

**AMENDED COMPLAINT**

1. Plaintiff, Lorian Crawford ["Plaintiff" or "Ms. Crawford"], is a resident of Shelby County, Tennessee. Specifically, Plaintiff resides at 1001 June Road, Memphis, Tennessee 38119.

2. Defendant, Pilot.com, Inc. ["Pilot"], is a Delaware Corporation with its principal place of business in San Francisco, California. Its registered agent for service of process is United Agent Group Inc., 205 Powell Place Brentwood, Tennessee 37027-7522.

3. This action is filed pursuant to the 42 U.S.C. § 1981, as amended; Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq* ["Title VII"]; and Americans with Disabilities Act of 1990, 42 U.S.C.S. § 12101, *et seq* ["ADA"]. Each of the foregoing statues provides in pertinent part that all employees should be protected from, *inter alia*, discrimination in employment and that all employees' interests in dignity and freedom from humiliation should be protected.

4. This action is also filed pursuant to the Family Medical Leave Act, 29 U.S.C. § 2601, *et seq*. ["FMLA"], which states in pertinent part that it shall be unlawful for any employer

to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under FMLA.

5. This Court has federal question jurisdiction over this case pursuant to 28 U.S.C. § 1331 and 1332.

6. This Court is the proper venue pursuant to 28 U.S.C. § 1391(b) and (c). Plaintiff worked at Pilot's facility in Davidson County, specifically the 2030 Lindell Avenue Nashville, Tennessee 37203 location, from 2019 until 2021. In 2021, Plaintiff began working remotely from her residence located at 1001 June Road, Memphis, Tennessee 38119.

7. Defendant employs more than 500 employees.

## 2019: GENESIS OF EMPLOYMENT

8. On or about September 23, 2019, Plaintiff was hired at Pilot as an Account Manager, a position in the Finance Operations ["FinOps"] department. She was hired to perform bookkeeping services for customers.

9. Plaintiff is a black female.

10. Throughout her employment, Plaintiff was a good, effective employee. Plaintiff had no discipline history prior to her termination.

## 2020

11. Sometime in 2020, a "Level 2" job role was added to Plaintiff's profile, or job role, without prior discussion. After the fact, Plaintiff was informed that her base salary was increased to account for Pilot's lack of tuition reimbursement benefits that were promised to her when she was hired. With the salary increase, Plaintiff was bumped into a "Level 2" job role.

12. Plaintiff brought this change to the attention of Director of R&D and Operations Ashley Schagrin ["Schagrin"] (white). Plaintiff told Schagrin that there should have been a

discussion for the transition, and the transition should have included a promotion and raise per precedent. Plaintiff is aware of other black employees who were hired around the same time as Plaintiff that had also been unilaterally assigned role levels without prior discussion who had issues with promotions and raises.

13. In April 2020, Plaintiff made Schragin and McKellar aware of her disabilities.

14. In the last quarter of 2020, Plaintiff became a Senior Account Manager and a pod lead within the Capricorn team with Andrew Bellieveau ["Bellieveau"] (white) as her supervisor. A pod lead is a "Level 3" position which was a promotion from Plaintiff's "Level 2" role. Typically, this kind of promotion comes with a raise.

15. Notably, Schagrin and Bellieveau personally requested that Plaintiff take on this new position. Additionally, they encouraged Plaintiff to sit for an internal certification exam. As an incentive, an incremental raise was also promised to those who passed the exam. Plaintiff passed the exam and accepted the position. However, Plaintiff did not receive any raise. Upon information and belief, Plaintiff was the only individual in the Senior Account Manager and pod lead role who did not receive a raise, and the only individual who passed the exam and did not receive the promised incremental raise.

16. Plaintiff reported this to Bellieveau and Jonathan Rivers, Plaintiff's former boss. Plaintiff was instructed to contact Schagrin regarding the lack of raise. Therefore, Plaintiff escalated her concern to the People Team ["HR"], Andre Moss ["Moss"], and Schagrin. Each time, Plaintiff was given no substantive answer to her complaints.

17. As a pod lead, Plaintiff was told she could pick two (2) individuals to be in her pod, so she selected two (2) black males because they had all worked well together. More specifically, Bellieveau thought Plaintiff would be the best person to lead one of the black males because she

had a good relationship with him, had developed solid communication processes with him, and they often worked together on Zoom. Moreover, for the other black male, Plaintiff had already trained him on various techniques and processes, and they often sat on Zoom together and worked. To Plaintiff's surprise, Bellieveau told her that could not happen because "then all black people will be together."

18. Plaintiff reported this to Schagrin because it had never been an issue if a pod consisted of all white individuals. Schagrin simply dismissed Plaintiff's concerns and indicated Plaintiff misunderstood Bellieveau's remark because Pilot decided that one of the black males Plaintiff picked for her team would become a Pod Lead as well.

19. However, the complete opposite occurred. A white female, who Bellieveau had suggested to be in Plaintiff's pod, was promoted to Pod Lead. She was also designated to manage the black male who Schagrin had indicated would become the next Pod Lead.

20. Plaintiff's report of a discriminatory remark was not taken seriously and no investigation was performed. This violated Pilot's Harassment Prevention Policy. Further, no management was disciplined for failing to follow company policy.

21. In December 2020, Plaintiff witnessed Madeline Lockhart's (black female) ["Lockhart"] situation regarding FMLA. Lockhart informed management that she had a medical condition and needed to utilize Pilot's unlimited sick leave policy for a medical procedure. Lockhart's supervisor had been flagged for discriminatory practices on multiple occasions but had built a close relationship with Co-Founder and CTO Jessica McKellar ["McKellar"]. McKellar denied Lockhart's request to utilize the unlimited sick leave just short of being eligible for FMLA. Lockhart was also constructively demoted to a part-time position. Pilot leadership claimed that Lockhart's leave could only be approved at the discretion of the leadership team.

22. However, in an effort to double down on its discriminatory practices, co-founder Jeff Arnold ["Arnold"] created and emailed a new leave policy, changing "unlimited PTO and sick leave" to "flexible PTO and accrued sick leave." Lockhart's condition worsened, and she was forced to leave Pilot.

23. After witnessing the company's actions against Lockhart, Plaintiff decided to speak up in an All Hands meeting to question the high turnover of black employees and the treatment of black employees.

24. Arnold responded publicly in an email to the entire company noting that Plaintiff's concerns were problematic.

25. After this, Plaintiff became the co-leader of the Black Employee Resource Group ["ERG"]. Plaintiff would host cultural awareness events and continue to speak up about the disparities within the company.

## 2021

26. In July 2021, Defendant announced that the company was reorganizing and that the Pod Lead position title would be named Senior Finance Operations Account Manager.

27. With this reorganization, Moss informed Plaintiff that Pilot did not want any Pod Leads or Team Leads to work remote. At this point, Plaintiff had moved to Memphis, so Moss suggested that Plaintiff transition to the Learning & Development team. Moss also told Plaintiff she would have been a great fit for the CRT role.

28. However, from July 2021 to December 2021, Plaintiff worked on random assignments as Senior Finance Operations Account Manager without a pod.

29. In September 2021, Plaintiff was on short term disability leave ["STD"] for approximately two (2) weeks.

5

## **2022**

30.     In January 2022, Plaintiff was reassigned to the G&A Internal Operations team as an Internal Operations Senior Associate, under the supervision of Cerisse Ned ["Ned"]. This was a demotion, and a textbook example of retaliation, even according to Pilot's policy. Initially, neither Plaintiff nor Ned were aware of Plaintiff's job responsibilities. Shortly after this transition, Ned informed Plaintiff she was leaving Pilot.

31.     Plaintiff was left with little to no guidance from Moss for several months after Ned left Pilot. Moss rarely kept regular 1:1 meetings or spent time on coaching, often complaining that he was too busy. Plaintiff constantly asked Moss what her role was and what her job responsibilities were in her new role.

32.     Initially, Plaintiff did one-off projects and escalations until a customer was flagged for money laundering. When Plaintiff informed Moss, she was instructed to look the other way.

33.     Eventually, in the Spring of 2022, Moss informed Plaintiff that she would begin working with Learning and Development Manager under FinOps Rebecca Sorell to develop and deliver new hire training.

34.     In the summer of 2022, Plaintiff had some personal events that required her to take off work. Specifically, Plaintiff was involved in a car accident in August 2022. Additionally, Plaintiff's father was hospitalized from June 2022 to September 2022, and he needed 24-hour care before being recommended for hospice.

35.     In June 2022, Plaintiff disclosed these events to Moss who stated he would report it to HR. Moss stated he would place Plaintiff on "makeshift intermittent leave" although she was eligible for FMLA leave starting in September 2020 – at the latest. However, Pilot did not initiate the FMLA process until October 2022.

36.     On "makeshift intermittent leave," Moss said Plaintiff could take off as much time as she needed, and he would ensure other employees would cover Plaintiff's job responsibilities in her absence. Plaintiff was assured she could work a flexible schedule, use the unlimited leave as needed, and get paid for her time off. Although the leave was not officially accounted for by HR or in the BambooHR system, Moss assured Plaintiff that it was approved by him, and he would get it straightened out if any issues came up. During their check-ins, Moss would mention that he had forgotten to flag Plaintiff's situation to HR because he was so busy and overworked, but he would work on it.

37.     Unbeknownst to Plaintiff, Pilot was using Plaintiff's request for leave to terminate her. Although Plaintiff had been requesting leave assistance for months in order to care for her father and herself, Pilot did not start the FMLA process until October 3, 2022.

38.     It was discovered during a phone call with Moss on October 3, 2022, that Pilot was trying to find a way to terminate Plaintiff while she did not have job protection under FMLA. Moss told Plaintiff Pilot was going to treat this as the first time it had heard of any FMLA request. Plaintiff was instructed to notate that the days taken off prior to October 3, 2022, were to be covered under Pilot's unlimited leave policy. Going forward, Plaintiff would use her FMLA leave. From October 3, 2022, until December 27, 2022, Plaintiff was on FMLA leave.

39.     Additionally, on October 3, 2022, People Operations Generalist Aisha Cook ["Cook"] (white) told Plaintiff that she did qualify for FMLA leave, then said she did not qualify. Cook also informed Plaintiff that she could not get time off for more than one bereavement per year. For context, Plaintiff's father did ultimately die. However, in the same calendar year, Plaintiff's grandmother also died, and she took time off for that.

40.     On November 11, 2022, while Plaintiff was still on leave, the Senior HR Business

7

Partner Alana White ["White"] (white) stated to Plaintiff that she did not believe that Plaintiff had a disability that she needed to come back to work and that she should basically get over it.

41. Pilot made multiple attempts via email and phone calls to persuade Plaintiff into dropping the FMLA leave request, its third-party benefit administrator leaked her private identifying information through an unsecured email, Pilot management impeded on her leave by reaching out about work related issues, and Plaintiff was pressured to cut her leave short. Pilot claimed that Plaintiff owed the company thousands of dollars, and she would need to come back to work early as repayment.

42. Also while on leave, Moss gave her a negative 360 review. A 360 review is a scale grading system the company uses to critique employee performance, that is conducted every six (6) months. Plaintiff received a "Meets Most Expectations" on her review which is equivalent to a "2" rating on a 5-point scale, with 1 being the lowest rating and 5 being the highest rating. In her evaluation, the words "will come back to this" were recorded in the remarks for her evaluation with no real indication of why she received that review.

43. Notably, Moss was not directly involved in the supervision of Plaintiff. In fact, after Ned left in the beginning of 2022, Plaintiff complained to Moss that she was not aware of a concrete job description or her responsibilities at the time. Further, Plaintiff was never properly coached or managed day to day which made it impossible for her to be evaluated for raises and/or promotions. In response, Moss brushed off her concerns and offered no solutions.

44. A "Level 2" white male who was supervised by Moss received "Exceeds Expectations" on his October 2022 evaluation, which included the reasons he received that review. A white female received a "Sets a New Bar" October 2022 performance evaluation with reasons as to why she received that review. Plaintiff's remark section for her performance evaluation,

however, was lacking.

45. Before Plaintiff was scheduled to return from FMLA leave on about December 27, 2022, she met with VP People Carmen Cooper ["Cooper"] and discussed some of her hardships, including the loss of over six (6) family members since August of that year. Plaintiff also mentioned that she felt fear of being targeted for layoff since she took a long leave of absence, although it was under STD and FMLA. Further, Plaintiff felt there was underlying tension with the HR team.

46. Cooper shared that the Operations Department was being restricted to better align with different types of customers. Cooper instructed Plaintiff to speak with Moss about how this would directly impact her team. However, Cooper assured Plaintiff that her re-acclimation to the team would be welcomed and that Plaintiff had nothing to worry about.

## 2023

47. In January 2023, Plaintiff applied for long term disability ["LTD"] benefits through Guardian, but her claims were denied. The primary reason for her claim to be denied was due to false information that Pilot's Human Resources ["HR"] department reported to Guardian, including, but not limited to, the dates Plaintiff was eligible for FMLA leave.

48. The week of January 3, 2023, Plaintiff was told in a one-to-one meeting with Moss that everyone on her team was being moved to new roles due to the reorganization. Plaintiff expressed her concerns regarding her inability to efficiently complete any of the roles suggested to her due to her disabilities and required accommodations. Notably, HR never initiated a formal accommodation process for Plaintiff after her return to work. Plaintiff's supervisors made informal accommodations although they were made aware of her disability before leaving on FMLA.

49. One of the individual's roles almost identically mirrored the duties of the role

Plaintiff had before she returned from FMLA. It appeared that the G&A Internal Operations team was "dismantled" and "reduced by one" only to have all three (3) members officially moved to the L&D department.

50. While happy for her "Co-Pilots," Plaintiff was confused when she received an email from the CEO on or about January 13, 2023, that was sent out stating that the company was going to lay off forty-seven (47) talented members of the team—eleven percent (11%) of the company—for financial reasons. It was stated in an All Hands Meeting that the layoff would not include the people on the Operations Team which Plaintiff had been told she would work on.

51. That same day, January 13, 2023, Plaintiff received a termination notice via email from the CEO Waseem Daher ["Daher"] stating that her position in Internal Ops was a part of Pilot's reduction in workforce and that her access to the company, even her email address was immediately revoked.

52. Plaintiff was caught by surprise that she was considered for a layoff when none of her meetings prior to the layoff insinuated that she should be nervous about her job.

53. On the same day, Plaintiff met with McKellar and Daher to further discuss her termination.

54. After, Plaintiff reached out to Daher concerning the reason for the layoff via email. McKeller and Arnold were looped into the email by Daher.

55. Plaintiff received correspondence from McKellar explaining the reason for the layoff including, but not limited to, the macroeconomic headwinds and the headcount reductions were determined based on business need, whether the functions of the role could be assumed by an employee in a different role, and performance. McKellar further stated that the Ops reorganization was independent of the layoff and that the reason for the reorganization was not to

eliminate the internal G&A team but to provide opportunities for internal mobility.

56. Plaintiff was told by McKellar that she could apply for an open position.

57. Plaintiff has never had to go through an application and evaluation process to move into a new role or be promoted during her tenure with the company as McKellar required through email correspondence.

58. Plaintiff was reporting directly to Moss from the time of her return from FMLA leave to the time of termination. McKellar stated that Moss was intentionally kept out of the loop about the planned reduction until January 12, 2023.

59. The following day, Moss reached out to Plaintiff and told her that he would give her a recommendation because he felt bad about what happened.

60. Plaintiff's job position, Internal Operations Senior Associate on the G&A Internal Operations team, falls under the G&A umbrella, but Plaintiff's assignments fell almost entirely under Operations. Of the four members of her team (two white and two black), she was selected as the only member on her team to be terminated.

61. Plaintiff applied for multiple positions within Pilot. However, she was not selected for any of the positions.

62. Specifically, on or about January 17, 2023, Plaintiff applied for the Senior Finance Operations Account Manager position in which she was qualified for and had previous work experience at Pilot. Plaintiff received the generic email stating she was not chosen at this time. Upon information and belief, Plaintiff was not even considered for new hire because of the termination, which again violates Pilot's Harassment Prevention policy and is further evidence of retaliation.

63. On or about January 18, 2023, Plaintiff learned of two people on her team, FinOps,

11

that received promotions to the Learning and Development Team. Notably, both individuals were white.

64. On or about February 7, 2023, Plaintiff filed her EEOC charge.

65. Notably, even after Plaintiff filed her EEOC charge, she continued to apply for open positions within Pilot, including positions that would fall below her qualifications. Plaintiff did not even receive follow up communications regarding these applications.

66. Upon information and belief, Arnold, who was still sore about Plaintiff's efforts to bring up the discrimination issue within the company targeted Plaintiff for termination and lobbied against her re-hire. Arnold had been publicly disparaging her behind her back and trying to get rid of her since 2021. Notably, it was Arnold who had direct oversight of the People and recruiting teams.

67. During Plaintiff's tenure at Pilot, she was told by one of the recruiters that, "the hiring process was racist" and "black people just did not get hired at the same rate as white people." The recruiter also believed that the company made it impossible to bring attention to the racist hiring practices.

68. Since her unlawful termination, Plaintiff has experienced a decline in her overall health including but not limited to increased emotional distress.

69. Because of her unlawful termination, Plaintiff is now suffering on-going loss of wages. Plaintiff had planned to work until age 70. She should be compensated for her wage losses and all other benefits she would have been entitled to had she remained employed.

70. As a direct and proximate result of the discriminatory acts set forth above, Plaintiff has suffered the following injuries, including but not limited to:

    a. Embarrassment;

        b.        Humiliation;

        c.        Loss of self-esteem;

        d.        Increased anxiety;

        e.        Damage of reputation; and

        f.        Loss of concentration.

71. The foregoing injuries set forth have been suffered and will continue to be suffered into the foreseeable future.

72. Plaintiff should be made whole for all injuries and losses suffered by Plaintiff as a proximate result of Defendant's unlawful acts.

73. Defendant has intentionally, willfully, and/or recklessly violated Plaintiff's rights. An award of punitive damages is appropriate under the law.

## COUNT I – RACE DISCRIMINATION § 1981

74. The allegations contained in paragraphs 1 through 73 are incorporated by reference into this Count I.

75. Federal law, specifically 42 U.S.C. § 1981, as amended, states in pertinent part that all employees should be protected from, inter alia, discrimination that all employees' interests in dignity and freedom from humiliation should be protected.

76. Plaintiff's adverse employment action was based on her race (black) in violation of 42 U.S.C. § 1981, as amended.

77. Accordingly, Plaintiff is entitled to a damages award against Defendant for all back pay, front pay, lost benefits, prejudgment interest, tax gross-up, attorney's fees, and expenses. Finally, because of Defendant's willful and intentional conduct and reckless disregard for Plaintiff's federally protected rights, Plaintiff is entitled to an award of punitive damages against

Defendant.

## COUNT II - TITLE VII RACE DISCRIMINATION

78. The allegations contained in paragraphs 1 through 73 are incorporated by reference into this Count II.

79. Plaintiff filed a Charge of Discrimination (No. 490-2023-01247) with the EEOC on February 7, 2023. The foregoing charge was filed within 300 days of Plaintiff's wrongful termination and is attached here as Exhibit A.

80. The Notice of Right to Sue was sent on the grounds that they will do no further investigation. The foregoing Complaint was filed within 90 days of Plaintiff's receival of the Right to Sue Letter on August 22, 2024. Attached as Exhibit B and incorporated by reference as though fully restated herein is Dismissal and Notice of Rights.

81. This claim was therefore timely filed, and Plaintiff has exhausted all of her administrative remedies on her claim.

82. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., provides in pertinent part that it shall be an unlawful employment practice for an employer to discharge any individual on the basis of race.

83. Plaintiff's termination was based on her race (black) in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e.

84. Accordingly, Plaintiff is entitled to a damages award against Defendant for all back pay, front pay, lost benefits, prejudgment interest, tax gross up, attorney's fees, and expenses. Finally, because of Defendant's willful and intentional conduct, Plaintiff is entitled to an award of punitive damages against Defendant.

## COUNT III - § 1981 RETALIATION

85. The allegations contained in paragraphs 1 through 73 are incorporated by reference into this Count III.

86. Federal law, specifically 42 U.S.C. § 1981, as amended, provides that an employer should not retaliate against employees for engaging in protected activity.

87. Plaintiff's termination was based on retaliation for her engagement in protected activity in violation of 42 U.S.C. § 1981, as amended.

88. Accordingly, Plaintiff is entitled to a damages award against Defendant for all back pay, front pay, lost benefits, prejudgment interest, tax gross-up, and attorney's fees and expenses. Finally, because of Defendant's willful and intentional conduct and reckless disregard for Plaintiff's federally protected rights, Plaintiff is entitled to an award of punitive damages against Defendant.

## COUNT IV – TITLE VII RETALIATION

89. The allegations contained in paragraphs 1 through 73 are incorporated by reference into this Count IV.

90. Plaintiff filed a Charge of Discrimination (No. 490-2023-01247) with the EEOC on February 7, 2023. The foregoing charge was filed within 300 days of Plaintiff's wrongful termination and is attached here as Exhibit A.

91. The Notice of Right to Sue was sent on the grounds that they will do no further investigation. The foregoing Complaint was filed within 90 days of Plaintiff's receival of the Right to Sue Letter on August 22, 2024. Attached as Exhibit B and incorporated by reference as though fully restated herein is Dismissal and Notice of Rights.

92. This claim was therefore timely filed, and Plaintiff has exhausted all of her

15

administrative remedies on her claim.

93. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., provides in pertinent part that it shall be an unlawful employment practice for an employer to discharge any individual in retaliation for her engagement in protected activity.

94. Plaintiff's termination was based on retaliation for her engagement in protected activity in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e.

95. Accordingly, Plaintiff is entitled to a damages award against Defendant for all back pay, front pay, lost benefits, prejudgment interest, tax gross-up, and attorney's fees and expenses. Finally, because of Defendant's willful and intentional conduct and reckless disregard for Plaintiff's federally protected rights, Plaintiff is entitled to an award of punitive damages against Defendant.

## **COUNT V – ADA DISCRIMINATION**

96. The allegations contained in paragraphs 1 through 73 are incorporated by reference into this Count V.

97. All of Plaintiff's diagnoses are considered a disability affecting her major life activities as described in 42 U.S.C.S. § 12102(1) – (2). Plaintiff made her supervisors aware of her disabilities. Defendant accommodated other employees with disabilities, but Defendant failed to extend the same to Plaintiff. Further, Defendant failed to make any effort to determine if Plaintiff, despite her disability, could perform the essential functions of her position with or without reasonable accommodations. But for Plaintiff's disability, she would still be an employee of Defendant.

98. Defendant failed to reasonably accommodate Plaintiff.

99. Accordingly, Plaintiff is entitled to a damages award against Defendant for all back

pay, front pay, lost benefits, prejudgment interest, tax gross-up, attorney's fees, and expenses. In addition, Plaintiff is entitled to reinstatement to her former position if that is determined to be the proper remedy with all back pay and benefits. Finally, because of Defendant's willful and intentional conduct and reckless disregard for Plaintiff's federally protected rights, Plaintiff is entitled to an award of punitive damages against Defendant.

## **PRAYERS FOR RELIEF**

WHEREFORE, Plaintiff prays that:

100. The Court order Defendant to rescind all adverse employment actions taken against Plaintiff.

101. The Court order Defendant to make Plaintiff whole for all lost wages and fringe benefits, back pay, front pay, loss of earning capacity, and emotional distress relating to Defendant's wrongful acts of discrimination.

102. The Court order Defendant to pay prejudgment interest, tax gross-up, attorney's fees, and expenses.

103. The Court order Defendant to reinstate Plaintiff with all back pay if that is determined to be the proper remedy.

104. The Court award Plaintiff punitive damages.

105. The Court award Plaintiff liquidated damages.

106. The Court grant Plaintiff all other relief to which she is entitled.

107. Plaintiff demands a jury trial.

                    Respectfully submitted,

                    /s/ Ralph T. Gibson
                    Ralph T. Gibson (BPR #14861)
                    GIBSON PERRYMAN LAW FIRM
                    *Attorney for Plaintiff*
                    5100 Poplar Avenue, Suite 2117
                    Memphis, Tennessee 38137
                    (901) 526-0412
                    Ralph@GibsonPerryman.com